UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> AVERY JAVIER, <br><br> Defendant. | 3:19-CR-00063-JMK-MMS <br><br> **FINAL REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS [DKT. 129]** |

## I. MOTION PRESENTED

The indictment, filed in June 2019, charges Avery Javier with one count of possessing controlled substances with intent to distribute.[1] Dkt. 2. Javier moves to suppress "all evidence" obtained from "the fruit of an illegal search and seizure." Dkt. 129 at 7. The government responds that (1) the totality of circumstances established reasonable suspicion to seize Javier, and (2) even if law enforcement lacked "particularized suspicion," law enforcement nonetheless "possessed reasonable suspicion as [Javier] acted within a group." *See generally* Dkt. 131.

This Court held oral argument in January 2023. Dkt. 134. Javier filed a post-hearing brief that same month. Dkt. 136. At the outset, this Court notes that the Report and

---

[1] 21 U.S.C. § 841(a)(1), (b)(1)(B)

Recommendation's inquiry is narrow: whether the initial detention of Javier was reasonable and not whether the search of Javier's backpack was reasonable or coerced.

This Court hereby issues its Final Report and Recommendation regarding Javier's Motion to Suppress. Dkt. 129. For the reasons below, Javier's Motion to Suppress should be **DENIED**. 28 U.S.C. § 636(b)(1)(B).

## II. FACTUAL HISTORY

The following facts are drawn from police reports, from a body cam video, and from party briefs. Dkt. 129; Dkt. 131 to 131-1; Dkt. 138; Def. Ex. D-1.

In the early morning hours of June 10, 2018, a group of five Alaskan residents, relevant among them Avery Javier, gathered at an apartment complex in Kodiak. They were drinking and intoxicated. Dkt. 131-1 at 4-5, 15; Def. Ex. D-1 at 01:49:00-01:52:00. A scuffle broke out, "over some stupid shit," at around 2:30 AM. Dkt. 131-1 at 3, 7, 15; Def. Ex. D-1 at 01:49:00-01:52:00. All group members characterized the scuffle as a loud and heated argument that never became physical. *Id.* at 4-9, 15. The law enforcement dispatcher painted a different picture: the 911 caller "did not know if there are any weapons being used. There are at least two people involved in the fight. And [] can definitely tell that fists [are] flying." Def. Ex. D-1 at 01:30-02:10. As the first responder, Officer A. Gebert arrived within minutes of the 911 call, parked his vehicle on the street adjacent to the entrance of the apartment's parking lot, and began running toward loud voices coming from the parking lot. Def. Ex. D-1 at 00:01-03:01. Once inside the parking lot, Officer Gebert's bodycam footage revealed that the area was completely dark. *Id.* at 03:02:-03:05.

The group members were scattered between three or four parking spaces and a pedestrian walkway to the apartment. *Id.*

It is at this juncture that Officer Gebert confronted the group and ordered them to "get on the ground now. Everybody on the ground." *Id.* at 03:02:-03:05. Officer Gebert then focused his flashlight and Taser on the nearest group member, later identified as Danny Javier, who was not complying with Officer Gebert's orders. *Id.* at 03:06-03:10. Danny Javier stopped after taking five to seven steps toward Officer Gebert, put his hand into his right pocket, and was immediately tased by Officer Gebert. *Id.* While pointing his flashlight between the incapacitated Danny Javier and the remainder of the group, Officer Gebert continued ordering everyone to get on the ground. *Id.* at 03:11-03:40. The government alleges that Officer Gebert witnessed Danny Javier throw out a bag filled with controlled substances before being tased. Dkt 131 at 2; Dkt. 131-1 at 3. Backup officers arrived within the minute after Officer Gebert notified dispatch that controlled substances were likely involved. Def. Ex. D-1 at 03:41-04:00. The entire group was then handcuffed and separated, possessions were collected, and some of the group was frisked for weapons or identification. *Id.* at 03:41-16:00. Paramedics were called thereafter. *Id.* at 16:00-18:00. Within the next two hours, Avery Javier was notified that he was free to leave, but consented to a search of his backpack. Def. Ex. D-1 at 00:17:00-2:23:22; Dkt. 131-1 at 9. Law enforcement subsequently discovered drug paraphernalia and methamphetamine inside the backpack. *Id.*

### III. LEGAL ANALYSIS

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. Amend. IV. "[N]ot all personal interactions between policemen and citizens involves seizures of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." *United States v. Mendenhall,* 446 U.S. 544, 552 (1980) (citing *Terry*, 392 U.S. 1, at 19, n.16) (citation cleaned up). Law enforcement officials may detain a suspect for a brief investigatory stop if there is reasonable suspicion, based on specific and articulable facts, that a crime will be or has been committed. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable suspicion requires "more than a hunch but less than probable cause." *Illinois v. Wardlow*, 528 U.S. a119, 123 (2000). Reasonable suspicion turns on the totality of the circumstances, and a federal court should uphold a brief investigatory step if "the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The Ninth Circuit has emphasized that there is "no bright line rule for determining when an investigatory [*Terry*] stop crosses the line and becomes an arrest; rather, whether an arrest has occurred" is necessarily fact-intensive. *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1193 n.13 (9th Cir. 2015) (citing *Allen v. City of L.A.*, 66 F.3d 1052, 1056 (9th Cir. 1995)). Moreover, there is no categorical rule that automatically voids a seizure when "reasonable suspicion of wrongdoing is not particularized to each member of a group of individuals present at the same location." *Id.* at 1194. Reasonable suspicion can extend to the entire group in question if the group "is

behaving as a unit" and law enforcement cannot ascertain "who is armed and dangerous or engaging in criminal acts and who is not." *Id.* at 1195.

To begin, the entire group, including Avery, was seized within the meaning of the Fourth Amendment. *Mendenhall,* 446 U.S. 544, 552 (1980) (citing *Terry*, 392 U.S. 1, at 19, n. 16). The entire group's freedom of movement was restrained as soon as Officer Gebert displayed a show of authority by ordering the group to get on the ground. *Id.* The infringement on personal liberty and freedom became all the more apparent when Officer Geber used physical force to protect himself from a possibly dangerous individual that disobeyed clear and unambiguous police orders. *Id.* In other words, it is beyond dispute that Fourth Amendment rights were triggered for Javier and the group members. *Id.*

The salient word in the Fourth Amendment is, of course, "unreasonable." Though Javier makes a valiant effort, this is not a case in which there was arbitrary and oppressive interference with Javier's freedom or liberty; it is one in which the seizure of Javier and the group was reasonable.

This Court first notes that the brief investigatory stop occurred in the early hours of a dark morning, in a poorly lit parking lot. The time of day is a factor that a reasonably prudent officer would take into account when assessing whether to stop and detain a group of individuals. The more limited an officer's situational awareness of the scene and of *several* individuals being contacted, the more danger that the group, collectively or individually, poses when compared to a bright-daylight stop. This is also not a situation where the circumstances changed between the time of the 911 dispatch call and Officer Gebert's arrival, that would consequently undermine the emergency nature of the 911 call.

Indeed, Officer Gebert was able to hear several loud voices as soon as he stepped outside his vehicle, despite being parked a significant distance away. Moreover, a careful review of the bodycam footage indicates that Officer Gebert had more than reasonable suspicion to initially seize the group for his safety. Instead of obeying clear orders, a group member made various suspicious movements, that included walking toward Officer Gebert, and reaching into his pockets as he drew close to Officer Gebert. Important here is that Javier does not dispute Officer Gebert's observations of controlled substances being dropped by the tasered group member. The observation of controlled substances provided additional reasonable suspicion, and further strengthened the inference that a crime was being, or had been, committed. That Officer Gebert was outnumbered 5 to 1 also reasonably increased his suspicion that his safety could be in danger. *Terry*, 392 U.S. at 27.

Under these circumstances, *Lyall*'s ruling regarding reasonable suspicion for groups does not undermine this Court's conclusion; it strengthens it. As mentioned above, it was impossible for Officer Gebert to divine who in the group was possibly dangerous or armed, and who was not, especially while simultaneously deploying the taser on Danny Javier. Moreover, the group, including Avery Javier, appeared to act as a unit. The five individuals, some of them family members, formed a common intent to meet to socialize and the individuals confirmed that they consumed liquor together. Indeed, the five individuals were within close proximity to one another when Officer Gebert arrived on scene. Taken together, Officer Gebert's reasonable suspicion of the group therefore extended to Avery Javier as an individual that was part of the group.

Neither was there an unreasonable extension of the initial seizure when law enforcement officials searched, positioned each individual a few feet apart, and waited while paramedics responded. It was appropriate to wait for medical units to arrive to ensure the health and safety of Avery Javier and the other individuals. It was apparent they had been drinking and were intoxicated. A taser had been deployed. It would have been irresponsible for law enforcement to disregard the possibility that some in the group were in need of medical attention. Pertinent here is that Avery Javier was notified that he was free to leave the scene, but nonetheless answered law enforcement questioning and consented to a search of his backpack.

All told, there was reasonable suspicion for the initial seizure.

## IV. CONCLUSION

For the reasons set forth above, Javier's Motion to Suppress should be **DENIED**. 28 U.S.C. § 636(b)(1)(B).

DATED this 30th day of January, 2023, at Anchorage, Alaska.

*s/ Matthew M. Scoble*
CHIEF U.S. MAGISTRATE JUDGE

Pursuant to D. Alaska Loc. Mag. R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than the CLOSE OF BUSINESS on February 13, 2023. Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. Miranda v. Anchondo, et al., 684 F.3d 844 (9th Cir. 2012). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation. United States v. Howell, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed five (5) pages in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or

recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed on or before the CLOSE OF BUSINESS on February 21, 2023. The parties shall otherwise comply with provisions of D. Alaska Loc. Mag. R. 6(a). Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment. See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).